T.C. Memo. 2006-229

UNITED STATES TAX COURT

WILLIAM H. AND JO ANNE LINDLEY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 6657-05L.                    Filed October 26, 2006.

<u>Asher B. Bearman</u>, <u>Jaret R. Coles</u>, <u>Jennifer A. Gellner</u>, <u>Terri A. Merriam</u>, and <u>Wendy S. Pearson</u>, for petitioners.

<u>Gregory M. Hahn</u> and <u>Thomas N. Tomashek</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HAINES, <u>Judge</u>:  Petitioners filed a petition with this Court in response to a Notice of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330 (notice of

determination) for 1987 through 1990.[1]  Pursuant to section

6330(d), petitioners seek review of respondent's determination.

The issue for decision is whether respondent abused his

discretion in sustaining the proposed collection action.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

The first, second, third, fourth, and fifth stipulations of fact

and the attached exhibits are incorporated herein by this

reference.[2]

Petitioners resided in Hoover, Alabama, when they filed

their petition.  Petitioners have been married for 20 years and

have two children, a 19-year old daughter and a 15-year old son.

---

[1]  Unless otherwise indicated, all section references are to
the Internal Revenue Code, as amended, and all Rule references
are to the Tax Court Rules of Practice and Procedure.  Amounts
are rounded to the nearest dollar.

[2]  Respondent reserved relevancy objections to many of the
exhibits attached to the stipulations of fact.  Fed. R. Evid. 402
provides the general rule that all relevant evidence is
admissible, while evidence which is not relevant is not
admissible.  Fed. R. Evid. 401 defines relevant evidence as
"evidence having any tendency to make the existence of any fact
that is of consequence to the determination of the action more
probable or less probable than it would be without the evidence."
While the relevance of some exhibits is certainly limited, we
find that the exhibits meet the threshold definition of relevant
evidence and are admissible.  The Court will give the exhibits
only such consideration as is warranted by their pertinence to
the Court's analysis of petitioners' case.

Respondent also objected to many of the exhibits on the
basis of hearsay.  Even if we were to receive those exhibits into
evidence, they would have no impact on our findings of fact or on
the outcome of this case.

At the time of trial, petitioner William H. Lindley (Mr. Lindley) was 58 years old, and petitioner Jo Anne Lindley (Mrs. Lindley) was 51. Petitioners both have high school educations and have taken some college classes. Mr. Lindley is a staff manager for Bell South, and Mrs. Lindley works for the Alabama Policy Institute.

In 1991, petitioners became partners in Washoe Ranches #3 J.V. (Washoe Ranches) and Timeshare Breeding Services 1989-1 J.V. (TBS 89-1), partnerships organized and operated by Walter J. Hoyt III (Hoyt).

From about 1971 through 1998, Hoyt organized, promoted, and operated more than 100 cattle breeding partnerships. Hoyt also organized, promoted, and operated sheep breeding partnerships. From 1983 to his subsequent removal by the Tax Court in 2000 through 2003, Hoyt was the tax matters partner of each Hoyt partnership. From approximately 1980 through 1997, Hoyt was a licensed enrolled agent, and as such, he represented many of the Hoyt partners before the Internal Revenue Service (IRS). In 1998, Hoyt's enrolled agent status was revoked. Hoyt was convicted of various criminal charges in 2000.[3]

---

[3] Petitioners ask the Court to take judicial notice of certain "facts" in other Hoyt-related cases and apply judicial estoppel to "facts respondent has asserted in previous [Hoyt-related] litigation". We shall do neither.

A judicially noticeable fact is one not subject to

(continued...)

Although petitioners did not become partners in Washoe Ranches and TBS 89-1 until 1991, they began claiming related losses and credits on their 1990 Federal income tax return.[4] Petitioners also carried back unused investment credits to 1987

---

[3](...continued)
reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b). Petitioners are not asking the Court to take judicial notice of facts that are not subject to reasonable dispute. Instead, petitioners are asking the Court to take judicial notice of the truth of assertions made by taxpayers and the Commissioner in other Hoyt-related cases. Such assertions are not the proper subject of judicial notice.

The doctrine of judicial estoppel prevents a party from asserting in a legal proceeding a claim that is inconsistent with a position successfully taken by that party in a previous proceeding. New Hampshire v. Maine, 532 U.S. 742, 749 (2001). Among the requirements for judicial estoppel to be invoked, a party's current litigating position must be "clearly inconsistent" with a prior litigating position. Id. at 750-751. Petitioners have failed to identify any clear inconsistencies between respondent's current position and his position in any previous litigation.

[4] Mr. Lindley testified and the parties stipulated that petitioners did not become partners until 1991. However, the timing of petitioners' losses and deductions is unclear, and their 1987-90 Federal income tax returns are not in the record. The Forms 4340, Certificate of Assessments, Payments, and Other Specified Matters, for petitioners' 1987-89 taxable years indicate that refunds were issued as the result of "tentative carryback [claims]". The Form 4340 for 1990 indicates that petitioners claimed a refund on their tax return. We infer that, while petitioners did not become partners until 1991, they began claiming Hoyt-related losses and credits in 1990. Such treatment is consistent with the timing of Hoyt-related deductions claimed by other Hoyt partners. See Keller v. Commissioner, T.C. Memo. 2006-166 (taxpayer became a partner in a Hoyt partnership in 1995 but began claiming deductions on his 1994 return).

through 1989. As a result of these losses and credits, petitioners reported overpayments of tax for 1987 through 1990 and received refunds in the amounts claimed for at least 1987 through 1989.

Respondent issued Washoe Ranches and TBS 89-1 notices of final partnership administrative adjustment (FPAAs) for at least their 1990 and 1991 taxable years.[5] After completion of the partnership-level proceedings, respondent sent petitioners a Form 4549A-CG, Income Tax Examination Changes, reflecting changes made for petitioners' 1987 through 1991 tax years on May 22, 2002. Respondent determined deficiencies in petitioners' income tax of $9,734, $11,717, $11,682, $8,445, and $9,492, respectively.

On June 3, 2004, respondent issued petitioners a Final Notice--Notice of Intent to Levy and Notice of Your Right to a Hearing (final notice). The final notice included petitioners' outstanding tax liabilities for 1987 through 1990.

In response to the final notice, petitioners submitted a Form 12153, Request for a Collection Due Process Hearing.

---

[5] The FPAAs are not in the record, nor are any other details regarding the partnership-level proceedings. Apparently, the tax matters partners for Washoe Ranches and TBS 89-1 filed petitions with this Court in response to the FPAAs, and the Court rendered an opinion in Durham Farms #1, J.V. v. Commissioner, T.C. Memo. 2000-159, affd. 59 Fed. Appx. 952 (9th Cir. 2003). While Durham Farms #1, J.V. lists TBS 89-1 as a petitioner, it does not list Washoe Ranches. Mr. Lindley testified that, while they became partners in Washoe Ranches, the partnership's name was later changed, which could explain the discrepancy.

Petitioners argued that the proposed levies were inappropriate, that they were entitled to relief based on equity, hardship, or public policy considerations, and that Mrs. Lindley was entitled to innocent spouse relief. Under "collection alternatives considered", petitioners checked only an installment agreement.

Petitioners' case was assigned to Settlement Officer Thomas Owens (Mr. Owens) in respondent's Birmingham, Alabama, Appeals office. Mr. Owens initially scheduled a telephone section 6330 hearing for October 28, 2004. However, after a conversation with petitioners' representative, Jennifer Gellner (Ms. Gellner), Mr. Owens agreed to delay the hearing to allow petitioners to submit an offer-in-compromise and any materials they wished to be considered.

On or around November 4, 2004, petitioners submitted to Mr. Owens a Form 656, Offer in Compromise, a Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals, and three letters setting out in detail petitioners' position regarding the offer-in-compromise. Petitioners attached several exhibits to the letters and provided a diskette containing 42 additional exhibits.

The Form 656 indicated that petitioners were seeking an offer-in-compromise based on doubt as to liability, doubt as to collectibility, or effective tax administration. Petitioners

offered to pay $40,413 to compromise their outstanding tax

liabilities for 1987 through 1995.[6]

On the Form 433-A, petitioners listed the following assets:

| Asset | Current Balance/Value | Loan Balance |
|---|---|---|
| Checking accounts | $739 | n/a |
| Individual retirement account | 17,937 | n/a |
| 1997 Ford F-150 | 4,355 | $4,505 |
| 1999 Toyota 4-Runner | 6,125 | 15,114 |
| 1987 Honda Accord | 425 | -0- |
| House | 223,200 | 259,295 |
| Personal effects | 6,000 | -0- |
| Total | 258,781 | 278,914 |

The loan balance on petitioners' home included the balance on a

first mortgage ($217,552) and the balance on a second mortgage

($41,743).  Petitioners also reported a "life annuity" valued at

$156,931, but did not include this as an asset because the

annuity payments were included in their gross monthly income.

Petitioners reported gross monthly income of $9,124,

representing Mr. Lindley's wages of $5,845, Mrs. Lindley's wages

of $1,779, and annuity payments of $1,500.  Petitioners also

reported the following monthly living expenses:

---

[6]  Respondent proposed a levy with respect to petitioners' 1987-90 taxable years only.  The details regarding petitioners' 1992-96 taxable years are not in the record.

| Expense item | Monthly Expense |
|---|---|
| Food, clothing and misc. | $2,450 |
| Housing | 2,421 |
| Transportation | 1,260 |
| Health care | 250 |
| Taxes | 2,038 |
| Life insurance | 105 |
| Other secured debt | 652 |
| Other expenses | 709 |
| Total | 9,885 |

The other expenses included $309 paid for their son's private schooling and $400 in attorney's fees paid to the Pearson and Merriam law firm for representation in Hoyt-related litigation.

In one of the letters, petitioners state that they are offering to pay $40,413 "for all Hoyt-related years to be paid in one lump sum payment * * *.  This offer assumes that the IRS will collect less than the Reasonable Collection Potential * * * based on special circumstances and/or Effective Tax Administration." The letter also included "background" information regarding the Hoyt partnerships and set out petitioners' "special circumstances".

In the remaining two letters, petitioners provided more "background" information and argued:  (1) Their case was a "longstanding" case; (2) the delay was attributable to the criminal investigation of Hoyt; (3) interest should be

compromised due to the longstanding nature of the case; (4) petitioners were defrauded by Hoyt; and (5) the offer-in-compromise should be accepted based on equity and public policy grounds.

On February 22, 2005, a telephone section 6330 hearing was held between Mr. Owens and Ms. Gellner.  During the hearing, Mr. Owens requested more information regarding changes in income and expenses reported on the Form 433-A, a second mortgage on petitioners' house obtained in May 2001, and refinancings of petitioners' house in June 2002 and February 2004.  Because she did not have the requested information, Mr. Owens allowed Ms. Gellner additional time to confer with petitioners.

On February 28, 2005, and March 3, 2005, petitioners sent additional letters to Mr. Owens explaining the changes in income and expenses, the second mortgage, and the refinancings.  With regard to the second mortgage and the refinancings, petitioners stated:

> The Lindleys obtained a second mortgage for $110,500.00 in May 2001 at 12.02% interest. * * *
>
> The June 2002 refinance absorbed all of the remaining $110,500.00 second mortgage except for $35,000.00, which could not be included because that amount exceeded 80% of the appraised value.  Thus, $35,000.00 was still at the high interest rate of 12.02% when the June 2002 refinance was complete.
>
> The February 2004 mortgage for $45,000.00 was used to pay the high interest $35,000.00, a $7,500.00 note with Telco Credit Union, and $2,500.00 toward credit cards.

> There never was and never has been any intent to dissipate assets. The taxpayers believed the amount due was still being determined in litigation.

In the February 28, 2005, letter, petitioners also stated:

> The taxpayers would like to substantially increase the Offer amount and abandon their special circumstances arguments related to retirement, medical conditions, and the fact that they are victims of a convicted felon. They would like to offer the full collection potential * * * of $150,000 contingent on acceptance of the payment on November 1, 2006.

On March 8, 2005, respondent issued petitioners a notice of determination.[7] Because he concluded that petitioners dropped their doubt as to collectibility with special circumstances and effective tax administration arguments, respondent did not address those arguments. Respondent determined that there was no doubt as to petitioners' liability because the assessments were made pursuant to decisions entered in Durham Farms #1, J.V. v. Commissioner, T.C. Memo. 2000-159, affd. 59 Fed. Appx. 952 (9th Cir. 2003).

In evaluating petitioners' offer-in-compromise based on doubt as to collectibility, respondent accepted the values of assets petitioners reported. Respondent did not include the value of the house, the 1997 Ford F-150, the 1999 Toyota 4-Runner, or the household goods in the calculation of petitioners'

---

[7] Respondent issued two nearly identical notices of determination, one addressed to Mr. Lindley and the other addressed to Mrs. Lindley. To avoid confusion, we refer to the notices of determination as a single notice of determination.

reasonable collection potential. Respondent included only the 80-percent quick sale value of the 1987 Honda Accord ($340) instead of the 100-percent value petitioners reported ($425). Instead of including the annuity payments in petitioners' gross monthly income, respondent treated the annuity as an asset with a value of $156,931. Respondent also included "other assets" worth $155,500, reflecting his determination that petitioners' May 2001 second mortgage and February 2004 refinancing were dissipations of assets. Respondent concluded that petitioners had net realizable equity in their assets of $331,447.

Respondent accepted petitioners' reported gross monthly income, less the annuity payments. Respondent also accepted petitioners' reported tax, health care, and life insurance expenses. However, respondent reduced petitioners' food, clothing, misc. expense to $868 and their housing and utilities expense to $1,235, to reflect national and local standards. Respondent also reduced their transportation expense to $1,149 and disallowed their "other secured debt" expense and their "other" expenses.

After making adjustments to their monthly expenses, respondent determined that petitioners had monthly disposable income of $1,979 and that $94,992 was collectible from their

future income.[8]  Respondent determined that petitioners'

reasonable collection potential was $426,439.  Respondent

concluded that because petitioners had the ability to pay the

currently assessed amount in full, their offer amount of $150,000

was not acceptable.  Further, respondent determined that

acceptance of an offer-in-compromise for 1991 through 1995 was

not possible because the years were still under examination.

In response to the notice of determination, petitioners

filed a petition with this Court on April 8, 2005.

OPINION

Section 7122(a) provides that "The Secretary may compromise

any civil * * * case arising under the internal revenue laws".

Whether to accept an offer-in-compromise is left to the

Secretary's discretion.  Fargo v. Commissioner, 447 F.3d 706, 712

(9th Cir. 2006), affg. T.C. Memo. 2004-13; sec. 301.7122-1(c)(1),

Proced. & Admin. Regs.

The regulations under section 7122(a) set forth three

grounds for the compromise of a tax liability:  (1) Doubt as to

liability; (2) doubt as to collectibility; or (3) promotion of

effective tax administration.  Sec. 301.7122-1(b), Proced. &

Admin. Regs.  While petitioners' Form 656 indicated that they

---

[8]  Because petitioners made a cash offer, respondent
considered 48 months of petitioners' disposable income ($1,979 x
48 months = $94,992).  See Internal Revenue Manual (IRM) sec.
5.8.5.5.

were seeking an offer-in-compromise based on doubt as to liability, doubt as to liability is no longer at issue.[9]

The Secretary may compromise a tax liability based on doubt as to collectibility where the taxpayer's assets and income are less than the full amount of the assessed liability. Sec. 301.7122-1(b)(2), Proced. & Admin. Regs. Generally, under the Commissioner's administrative pronouncements, an offer-in-compromise based on doubt as to collectibility will be acceptable only if it reflects the taxpayer's reasonable collection potential. Rev. Proc. 2003-71, sec. 4.02(2), 2003-2 C.B. 517, 517. In some cases, the Commissioner will accept an offer of less than the reasonable collection potential if there are "special circumstances". Id. Special circumstances are: (1) Circumstances demonstrating that the taxpayer would suffer economic hardship if the IRS were to collect from him an amount equal to the reasonable collection potential; or (2) circumstances justifying acceptance of an amount less than the reasonable collection potential of the case based on public policy or equity considerations. See IRM sec. 5.8.4.3(4).

_____

[9] Petitioners did not present testimony or exhibits to substantiate doubt as to liability. Further, petitioners did not address doubt as to liability in their opening brief. In his answering brief, respondent asserts that petitioners abandoned their doubt as to liability argument. Petitioners did not challenge this assertion in their reply brief. Based on the above, we conclude that petitioners have abandoned their doubt as to liability argument.

The Secretary may compromise a tax liability on the ground of effective tax administration when: (1) Collection of the full liability will create economic hardship; or (2) exceptional circumstances exist such that collection of the full liability would undermine public confidence that the tax laws are being administered in a fair and equitable manner; and (3) compromise of the liability would not undermine compliance by taxpayers with the tax laws. Sec. 301.7122-1(b)(3), Proced. & Admin. Regs.

Petitioners proposed an offer-in-compromise based alternatively on doubt as to collectibility, doubt as to collectibility with special circumstances, or effective tax administration. Petitioners formally offered to pay $40,413 to compromise their outstanding tax liabilities for 1987 through 1995 and later increased their offer amount to $150,000.[10] Respondent determined that petitioners abandoned their doubt as to collectibility with special circumstances and effective tax administration arguments and that, because they had the ability to pay the currently assessed tax in full, they are not entitled to an offer-in-compromise based on doubt as to collectibility.

---

[10] The proposed collection action related to petitioners' outstanding tax liability for 1987-90 only. However, petitioners also sought to compromise their outstanding tax liability for 1991-95. The total assessed amount for 1987-95 is not in the record, and, therefore, no reliable comparison can be made between the offer amount and the amount assessed.

Because the underlying tax liability is not at issue, our review under section 6330 is for abuse of discretion. See Sego v. Commissioner, 114 T.C. 604, 610 (2000); Goza v. Commissioner, 114. T.C. 176, 182 (2000). This standard does not ask us to decide whether in our own opinion petitioners' offer-in-compromise should have been accepted, but whether respondent's rejection of the offer-in-compromise was arbitrary, capricious, or without sound basis in fact or law. Woodral v. Commissioner, 112 T.C. 19, 23 (1999); Keller v. Commissioner, T.C. Memo. 2006-166; Fowler v. Commissioner, T.C. Memo. 2004-163.

A.  Doubt as to Collectibility With Special Circumstances and Effective Tax Administration

Mr. Owens did not determine whether petitioners were entitled to an offer-in-compromise based on doubt as to collectibility with special circumstances or effective tax administration because he concluded that petitioners had abandoned those arguments in their February 28, 2005, letter. Petitioners assert that they only agreed to abandon those positions contingent upon Mr. Owens's acceptance of their increased offer amount. Because he did not accept the increased offer amount, petitioners argue that Mr. Owens abused his discretion by failing to consider their special circumstances and effective tax administration arguments. Petitioners' argument is not supported by the record.

In the February 28, 2005, letter, petitioners stated:

> The taxpayers would like to substantially increase the Offer amount <u>and</u> abandon their special circumstances arguments related to retirement, medical conditions, and the fact that they are victims of a convicted felon. <u>They would like to offer the full collection potential * * * of $150,000 contingent on acceptance of the payment on November 1, 2006</u>. [Emphasis added.]

Contrary to petitioners' assertion, this letter does not state that the abandonment of their special circumstances arguments is contingent upon acceptance of their increased offer amount. Instead, the letter communicates petitioners' intention to do two things, "[1] substantially increase the offer amount <u>and</u> [2] abandon their special circumstances arguments". (Emphasis added.) The only contingency expressed is that they would increase the offer amount only if the payment would be accepted on November 1, 2006. In addition, Mr. Owens credibly testified that he did not recall petitioners' stating that their abandonment of the special circumstances argument was contingent upon acceptance of the increased offer amount. Given the above-quoted language, it was not arbitrary or capricious for Mr. Owens to conclude that petitioners had abandoned their doubt as to collectibility with special circumstances and effective tax administration arguments.

Even assuming arguendo that Mr. Owens should have made a final determination with respect to petitioners' doubt as to collectibility with special circumstances and effective tax

administration arguments, we would not find that Mr. Owens abused his discretion by rejecting petitioners' offer-in-compromise. An offer-in-compromise based on doubt as to collectibility with special circumstances or effective tax administration must be viewed against the backdrop of section 301.7122-1(b)(3)(iii), Proced. & Admin. Regs.[11] See Barnes v. Commissioner, T.C. Memo. 2006-150. That section requires that Mr. Owens deny petitioners' offer-in-compromise if its acceptance would undermine voluntary compliance with tax laws by taxpayers in general.

Compromising petitioners' case on grounds of public policy or equity would not enhance voluntary compliance by other taxpayers. Instead, it would place the Government in the unenviable role of an insurer against poor business decisions by taxpayers, reducing the incentive for taxpayers to investigate thoroughly the consequences of transactions into which they enter. It would be particularly inappropriate for the Government to play that role here, where the transaction at issue is participation in a tax shelter. Reducing the risks of participating in tax shelters would encourage more taxpayers to

---

[11] The prospect that acceptance of an offer-in-compromise will undermine compliance with the tax laws militates against its acceptance whether the offer-in-compromise is predicated on promotion of effective tax administration or on doubt as to collectibility with special circumstances. See Rev. Proc. 2003-71, 2003-2 C.B. 517; IRM sec. 5.8.11.2.2; see also Barnes v. Commissioner, T.C. Memo. 2006-150.

run those risks, thus undermining rather than enhancing compliance with the tax laws. See Barnes v. Commissioner, supra.

On brief, petitioners advance numerous arguments relating to doubt as to collectibility with special circumstances and effective tax administration. Because we find that Mr. Owens did not abuse his discretion in concluding that petitioners had abandoned those arguments, we need not address those arguments.

B.  Doubt as to Collectibility

Petitioners assert that Mr. Owens erroneously determined their reasonable collection potential by:  (1) Reducing their allowable housing and utilities expense from $2,421 to $1,235 and disallowing their second mortgage expense; (2) reducing their allowable food, clothing, misc. expense from $2,450 to $868; (3) disallowing their other expenses; (4) failing to reduce the value of the annuity by its liquidation costs; and (5) including $155,500 in "other assets" to reflect the dissipation of assets.[12]  Although Mr. Owens made some errors in calculating

---

[12]  Petitioners also argue that Mr. Owens erred by not allowing as a monthly expense $600 given to their daughter to pay for college-related expenses.  This "expense" was not listed on petitioners' Form 433-A or other letters, nor did they indicate that the $600 was part of another expense, such as food, clothing, misc. or other expenses.  On brief, petitioners do not show when, if at all, they brought this expense to Mr. Owens's attention.  Because this expense was not before Mr. Owens, it is not relevant to our determination of whether Mr. Owens abused his discretion.

(continued...)

petitioners' reasonable collection potential, we find that those errors were harmless because, even when corrected, petitioners' reasonable collection potential exceeds their offer amount.

1.  Petitioners' Income and Expenses

    a.  Housing and Utilities Expense

Section 7122(c)(2)(A) provides that "the Secretary shall develop and publish schedules of national and local allowances designed to provide that taxpayers entering into a compromise have an adequate means to provide for basic living expenses." Section 7122(c)(2)(B) provides that the national and local allowances should not be used "to the extent such use would result in the taxpayer not having adequate means to provide for basic living expenses."

Mr. Owens used national and local standards to determine petitioners' allowable housing and utilities expense, including their second mortgage expense. Petitioners assert that, by not allowing their actual expenses, they will not have adequate means to provide for basic living expenses. However, petitioners did not provide any information to Mr. Owens or to the Court showing that they would be unable to provide for basic living expenses if only allowed the national and local standards. Given the lack of

---

[12](...continued)
Petitioners do not dispute respondent's reduction of their transportation expenses.

supporting information, it was not arbitrary or capricious for Mr. Owens to use national and local standards in determining petitioners' allowable housing and utilities expense, including the second mortgage expense.

### b. Food, Clothing, etc. Expense

Mr. Owens used national standards for a family of 1 to determine petitioners' allowable food, clothing, etc. expense. Petitioners argue that Mr. Owens abused his discretion by using the standard for a family of 1 instead of a family of 4. As described above, petitioners did not show they would be unable to provide for basic living expenses if only allowed the national and local standards. Mr. Owens's use of such standards was not arbitrary or capricious. However, Mr. Owens erred by using the national standard for a family of 1. Mr. Owens acknowledged his mistake and testified that he should have used the national standard for a family of 4, which was $1,564.

### c. Other Expenses: Son's Education Expense

Mr. Owens disallowed petitioners' other expenses, which included $309 per month for their son's private education. IRM section 5.8.5.5.3(6) states that "Expenses for dependents to attend * * * private schools are not allowed unless the dependents have special needs that cannot be met by public schools." Petitioners presented no information to indicate their

son had special needs which could not be met by public schools. It was not arbitrary and capricious for Mr. Owens to disallow the school-related expense.

### d. Other Expenses: Attorney's Fees

IRM section 5.15.1.10(3) provides that attorney's fees are necessary expenses if "Representation before the Service is needed". Petitioners presented information to Mr. Owens establishing that they paid $400 per month in attorney's fees, and that those fees were in connection with their Hoyt-related litigation. Mr. Owens erred by disallowing petitioners' attorney's fees.

### e. Amount Collectible From Future Income

Taking the above into consideration, the following chart summarizes petitioners' monthly disposable income:

| Income/Expense | Amount |
| --- | --- |
| Mr. Lindley's gross wages | $5,845 |
| Mrs. Lindley's gross wages | 1,779 |
| Food, clothing, misc. | (1,564) |
| Housing and utilities | (1,235) |
| Transportation | (1,149) |
| Taxes | (2,038) |
| Health care | (250) |
| Life insurance | (105) |
| Attorney's fees | (400) |
| Monthly disposable income | 883 |

Thus, $42,384 is collectible from petitioners' future income.[13]

 2.   Petitioners' Assets

  a.   Annuity

Instead of including the annuity payments in petitioners' gross monthly income, Mr. Owens included the annuity as an asset. Petitioners do not dispute treating the annuity as an asset, but they argue that Mr. Owens erred by not decreasing the value of the annuity by the tax consequences of its liquidation.  Mr. Owens testified that he should have decreased the value of the annuity to account for the tax consequences.  However, Mr. Owens did not calculate the tax consequences.  In their February 28, 2005, letter, petitioners estimated that the after-tax value of the annuity was $104,135.  Because Mr. Owens did not determine the annuity's after-tax value, we shall accept petitioners' estimated value.

  b.   Dissipated Assets

 Mr. Owens determined that petitioners were intentionally dissipating their assets when they obtained a second mortgage in May 2001 and refinanced a portion of that mortgage in February 2004.  Essentially, Mr. Owens determined that petitioners were pulling equity out of their house without consideration for their outstanding tax liabilities.  Mr. Owens included the amount of

---

  [13]   Because petitioners made a cash offer, respondent considered 48 months of petitioners' disposable income ($883 x 48 months = $42,384).  See IRM sec. 5.8.5.5.

the second mortgage and the February 2004 refinancing ($155,500) as an "other asset" in his calculation of petitioners' reasonable collection potential.

Petitioners presented information to Mr. Owens which showed, with the exception of $10,000 used to pay creditors from the February 2004 refinancing, they did not pull any equity out of the house. Instead, they were only attempting to get lower interest rates and reduce their monthly payments. For this reason, Mr. Owens's determination that the entire amount of the second mortgage and the February 2004 refinancing was a dissipation of assets is not supported by the record.[14] However, as petitioners concede in their February 28, 2005, letter, $10,000 of equity was pulled from the home in the February 2004 refinancing to pay creditors and was thus a dissipation of assets.

        c.    Net Realizable Equity in Assets

Taking the above into consideration, the following chart summarizes the net realizable equity in petitioners' assets:

---

[14] Respondent cites Mr. Lindley's testimony that $70,000 of the May 2001 second mortgage was used to pay credit card debts as evidence that petitioners were intentionally dissipating assets. When his testimony is taken in context, it is obvious that Mr. Lindley was confused as to the details of the second mortgage and the two refinancings. Mr. Lindley's confused testimony does not outweigh the other information indicating that only $10,000 in equity was pulled from the house.

| Asset | Equity |
|---|---|
| Checking account | $739 |
| Individual retirement account | 17,937 |
| Annuity | 104,135 |
| 1987 Honda Accord | 340 |
| Dissipated asset | 10,000 |
| Total | 133,151 |

### 3. Summary

Petitioners' reasonable collection potential is $175,535. Because their reasonable collection potential is greater than their offer amount, we find that Mr. Owens's rejection of petitioners' offer-in-compromise based on doubt as to collectibility was not arbitrary or capricious.

### C. Petitioners' Other Arguments

#### 1. Information Sufficient for the Court To Review Respondent's Determination

Petitioners argue that respondent failed to provide the Court with sufficient information "so that this Court can conduct a thorough, probing, and in-depth review of respondent's determinations." Petitioners' argument is without merit.

Generally, a taxpayer bears the burden of proving the Commissioner's determinations incorrect. Rule 142(a)(1); Welch

v. Helvering, 290 U.S. 111, 115 (1933).[15] The burden was on petitioners to show that respondent abused his discretion. The burden was not on respondent to provide enough information to show that he did not abuse his discretion. Nevertheless, we find that we had more than sufficient information to review respondent's determination.

2. Mrs. Lindley's Innocent Spouse Case

Petitioners argue that the final notice is invalid as it relates to Mrs. Lindley because she has an innocent spouse case pending before the Tax Court at docket No. 13872-04. In the alternative, petitioners ask us to determine that Mrs. Lindley is in innocent spouse. This issue is moot because, on April 6, 2006, the Tax Court entered a stipulated decision in docket No. 13872-04 reflecting the parties' agreement that Mrs. Lindley "is not entitled to relief under I.R.C. section 6015(b) or (f) with respect to her income tax liabilities for the taxable years 1987, 1988, 1989, 1990, and 1991."

---

[15] While sec. 7491 shifts the burden of proof and/or the burden of production to the Commissioner in certain circumstances, this section is not applicable in this case because respondent's examination of petitioners' returns did not commence after July 22, 1998. See Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c), 112 Stat. 727.

3.  Unassessed Years

Petitioners argue that respondent abused his discretion by failing to consider their offer-in-compromise as it relates to their unassessed tax years, 1991 through 1995. Respondent proposed collection action for only 1987 through 1990. The ultimate issue in this case is whether respondent abused his discretion in determining that collection action for 1987 through 1990 may proceed. Whether respondent can or should compromise petitioners' tax liability for years outside of those for which collection action has been proposed is not relevant to our determination. Petitioners' argument is without merit.

4.  Efficient Collection Versus Intrusiveness

Petitioners argue that respondent failed to balance the need for efficient collection of taxes with the legitimate concern that the collection action be no more intrusive than necessary. See sec. 6330(c)(3)(C). Petitioners' argument is not supported by the record.

Petitioners have an outstanding tax liability. In their section 6330 hearing, petitioners proposed only an offer-in-compromise. Because no other collection alternatives were proposed, there were not less intrusive means for respondent to consider. We find that respondent balanced the need for efficient collection of taxes with petitioners' legitimate concern that collection be no more intrusive than necessary.

D. <u>Conclusion</u>

Petitioners have not shown that respondent's determination was arbitrary or capricious, or without sound basis in fact or law.  For all of the above reasons, we hold that respondent's determination was not an abuse of discretion, and respondent may proceed with the proposed collection action.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be</u>

<u>entered for respondent</u>.