T.C. Memo. 2020-110

UNITED STATES TAX COURT

ROBERT ELKINS, Petitioner <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12315-17L.　　　　　　　　Filed July 16, 2020.

<u>Frank Agostino</u> and <u>Andrew D. Lendrum</u>, for petitioner.

<u>Frederick C. Mutter</u>, <u>Michael S. Rapiejko</u>, and <u>Mimi M. Wong</u>, for

respondent.

MEMORANDUM OPINION

URDA, <u>Judge</u>:  In this collection due process (CDP) case Robert Elkins

seeks review pursuant to sections 6320(c) and 6330(d)(1)[1] of the determination of

---

[1]Unless otherwise indicated, all section references are to the Internal

(continued...)

[*2] the Internal Revenue Service (IRS) Office of Appeals[2] to uphold the filing of

a notice of Federal tax lien (NFTL) with respect to his unpaid Federal income tax

liabilities for 1998, 2000, and 2001, as well as associated interest and penalties.

Dr. Elkins' underlying liabilities stemmed from computational adjustments[3] made

by the IRS after this Court's decision readjusting the tax reporting of Delta

Trading Partners IV, LP (Delta Trading), a partnership in which Dr. Elkins had

participated.

Respondent has filed a motion for summary judgment, while Dr. Elkins has

moved for a remand to the Office of Appeals. The main issue before us is whether

the Office of Appeals abused its discretion when it sustained the rejection of Dr.

Elkins' offer-in-compromise (OIC) on the ground that it was not in the best

---

[1](...continued)
Revenue Code (Code) in effect at all relevant times, and all Rule references are to
the Tax Court Rules of Practice and Procedure. We round all monetary amounts
to the nearest dollar.

[2]On July 1, 2019, the Office of Appeals was renamed the Independent
Office of Appeals. See Taxpayer First Act, Pub. L. No. 116-25, sec. 1001, 133
Stat. at 983 (2019). As the events in this case predate that change, we will use the
name in effect at the times relevant to this case, i.e., the Office of Appeals.

[3]The term "computational adjustment" means "the change in the tax liability
of a partner which properly reflects the treatment under this subchapter of a
partnership item." Sec. 6231(a)(6).

**[\*3]** interest of the Government.  Seeing no abuse of discretion, we will grant respondent's motion and deny that of Dr. Elkins.

## Background

The following facts are based on the parties' pleadings and motion papers, including the attached declarations and exhibits.  See Rule 121(b).  Dr. Elkins lived in Florida when he timely filed his petition.

A.    Dr. Elkins' Background

Dr. Elkins rose to prominence as the founder and chief executive officer of Integrated Health Services, Inc. (IHS), one of the nation's largest nursing home chains during the late 1990s.  Although he left IHS, Dr. Elkins stayed in the healthcare field, founding, advising, and, at times, investing in various healthcare businesses, including companies owned by Shirlene Elkins, his wife until their divorce in January 2014.

B.    Delta Trading Proceedings

1.    Examination

Dr. Elkins was one of two partners in Delta Trading, a partnership formed in 1998 that engaged in transactions involving notional principal contracts during

[*4] 1998 and 1999 before ceasing operations in 2000.[4]  Dr. Elkins owned 99% of Delta Trading and was the sole limited partner.  Quellos Capital Management, LP (Quellos), then doing business as Quadra Capital Management, LP, held a 1% interest as a general partner and acted as the tax matters partner.

The Commissioner opened an examination into Delta Trading's income tax returns for 1998 and 1999.  At several points during the examination the Commissioner and Quellos extended the period for assessment against Delta Trading's partners of any Federal income tax attributable to partnership items of Delta Trading.  These extensions were embodied in a series of Forms 872-P, Consent to Extend the Time to Assess Tax Attributable to Partnership Items, and later a Form 872-O, Special Consent to Extend the Time to Assess Tax Attributable to Partnership Items, which suspended the assessment period until one year after any determination of the partnership items following the Commissioner's issuance of a notice of final partnership administrative adjustment (FPAA) to Delta Trading became final.  In November 2008 the Commissioner issued an FPAA to Delta Trading determining that its notional principal contract

---

[4]"A notional principal contract is a contract that provides for the payment of amounts by one party to another at specified intervals calculated by reference to a specified index upon a notional principal amount in exchange for specified consideration or a promise to pay similar amounts."  Highwood Partners v. Commissioner, 133 T.C. 1, 13-14 (2009).

[*5] transactions "lacked economic substance" and that Delta Trading was a sham that should be disregarded for tax purposes.

## 2. Tax Court Case

Quellos, as Delta Trading's tax matters partner, brought a timely petition in this Court under the unified audit and litigation partnership procedures of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA) challenging the FPAA. See secs. 6221-6234 (as in effect for years before 2018). Dr. Elkins later moved for leave to participate in the TEFRA proceeding on the ground that Quellos had entered into a settlement agreement with the Commissioner, leaving him as the sole nonsettling partner.[5] The Court granted Dr. Elkins' motion. He subsequently filed a notice of election to participate, explaining that he satisfied the requirements for participation as set forth in section 6226(d) in that he "was a partner during the applicable period(s) for which readjustment of partnership items is sought and, if such readjustment is made, the tax attributable to such partnership items may be assessed against him."

Dr. Elkins and the Commissioner engaged in settlement negotiations, which bore fruit in the form of a joint stipulation of settled issues that "resolve[d] all of

_____

[5]The Commissioner thereafter filed a notice formally apprising the Court that he had finalized a settlement with Quellos in 2010.

**[\*6]** the issues in this case." The stipulation, which was signed by counsel for Dr. Elkins[6] and for the Commissioner, specified the adjustments to certain amounts of income and deductions reported on Delta Trading's 1998 and 1999 Forms 1065, U.S. Return of Partnership Income. The stipulation further reflected the parties' agreement that any underpayment of tax attributable to partnership item adjustments would be subject to a 5% accuracy-related penalty.

The Commissioner subsequently filed a motion for entry of decision, noting that he had entered into a settlement with Quellos in 2010 and that Dr. Elkins did not object to the granting of the motion. The Commissioner detailed that "[a]ll partners of the partnership that meet the interest requirements of I.R.C. § 6226(d) are treated as parties to this action". He further explained that, "[o]nce a decision is entered in this matter, Respondent intends to assess Participant Robert N. Elkins by way of computational adjustment based on the decision."

We granted the Commissioner's motion and entered a decision consistent with the stipulation of settled issues. See Delta Trading Partners IV, LP v.

---

[6]In February and November 2011 certain lawyers entered appearances in this Court on behalf of the petitioner, Quellos, which was Delta Trading's tax matters partner. As clarified in a later motion to withdraw granted by this Court, these lawyers, in fact, represented Dr. Elkins and acted exclusively on his behalf at all times. The incorrect designation on their entries of appearance appears to have been an inadvertent error stemming from the fact that Dr. Elkins was the sole active participant (on the petitioner's side) at the time.

**[\*7]** <u>Commissioner</u>, T.C. Dkt. No. 8513-09 (Sept. 10, 2012) (stipulated decision).

That decision became final on December 10, 2012.  <u>See</u> secs. 7481, 7483.

C.    OIC Proceedings

In November and December 2013 the IRS made computational adjustments

to Dr. Elkins' 1998, 2000, and 2001 Federal income tax returns consistent with

our decision with respect to Delta Trading.  After providing notice of these

adjustments to Dr. Elkins, the IRS assessed against him more than $10 million in

income tax deficiencies, accuracy-related penalties, and interest.[7]

1.    OIC Submission

On January 6, 2014, Dr. Elkins submitted a Form 656, Offer in

Compromise, to the IRS Centralized Offer in Compromise (COIC) unit proposing

to settle his tax debt for $17,500.  In his Form 656 and a supporting statement Dr.

Elkins premised his OIC on doubt as to collectibility, noting that "I am 71 years

old.  My wife has filed for divorce.  I am unemployed and do not have substantial

---

[7]Once the decision in a partnership-level proceeding is final, the Commissioner is permitted to assess computational adjustments that do not require partner-level determinations against a partner without first issuing a notice of deficiency.  <u>See</u> secs. 6225, 6230(a)(1); <u>see also</u> <u>Adkison v. Commissioner</u>, 129 T.C. 97, 102 (2007), <u>aff'd</u>, 592 F.3d 1050 (9th Cir. 2010); sec. 301.6231(a)(6)-1(a), Proced. & Admin. Regs.

[*8] assets or income." He asserted that his reasonable collection potential (RCP)[8] was limited to $15,500, the purported value of an art collection and wine that he owned. He enclosed $3,500 with his OIC and represented that, upon acceptance, he would pay the remaining balance of $14,000 within five months.

Dr. Elkins submitted with his OIC a Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals, accompanied by three months of bank statements. He reported monthly household income of $2,059 from Social Security and identified only a few personal assets: $581 held in bank accounts, a leased 2014 Audi A6 (with a $630 monthly payment that started on December 30, 2013), an art collection valued at $8,000, and wine valued at $7,500. Dr. Elkins claimed total monthly household expenses of $3,827.

In an attachment to the Form 433-A Dr. Elkins further disclosed that in 2013 he transferred stock to his then wife which was later sold for $240,000 (after

---

[8]The Commissioner has promulgated guidelines for the evaluation of offers. See, e.g., Churchill v. Commissioner, T.C. Memo. 2011-182, 102 T.C.M. (CCH) 116, 117 (2011). The calculation of a taxpayer's RCP occupies a central place in those guidelines. See id.; see also Internal Revenue Manual (IRM) pt. 5.8.5.1 (Sept. 23, 2008). A settlement officer derives the RCP from her estimate of a taxpayer's assets and likely future income. See IRM pt. 5.8.5.4 (Sept. 30, 2013), 5.8.5.20 (Sept. 30, 2013). Likely future income, in turn, is determined by multiplying a taxpayer's monthly disposable income (gross income minus necessary living expenses) by a certain number of months. See id. pt. 5.8.5.22 (Oct. 22, 2010), 5.8.5.25 (Sept. 30, 2013).

**[*9]** paying administrative expenses). Dr. Elkins explained that these funds "were used to pay household living expenses" and that "some of the funds will be returned to me in the form of equitable distribution from the divorce."

2.     Evaluation by Offer Specialist

Dr. Elkins' OIC was assigned to an offer specialist from the COIC unit for evaluation.

a.     Correspondence With Dr. Elkins

Beginning in October 2014 the offer specialist corresponded with Dr. Elkins (through his representatives) to obtain general information regarding his finances and supporting documentation including tax returns, bank and credit card statements, rental and mortgage agreements, a copy of his final divorce decree, proof of his stock transfer to his then wife in 2013, and documentation of medical expenses. One of the primary points of interest was the intertwined financial and professional relationships between the recently divorced spouses. As part of their divorce each spouse had agreed to keep his or her own assets and liabilities; the offer specialist thus asked Dr. Elkins to clarify the provenance of various expenditures and accounts.

In a related vein Dr. Elkins explained that he had an ongoing professional relationship with Common Sense Holdings, a holding company owned by his ex-

[*10] wife, which, in turn, owned Cameo Home Health, Home Advantage, and other healthcare entities. Before the divorce Dr. Elkins worked as a part-time financial officer for Cameo Home Health and Home Advantage. He informed the offer specialist that he received no compensation for his work but that his then wife "provided for all his needs". A year after the divorce Dr. Elkins represented that he was continuing to provide free financial consulting services to these companies, although he planned to leave the position "soon".

Dr. Elkins also addressed a promissory note, stating that he had transferred a 20% interest in certain corporations to his then wife in 2013 and that she sold the interest later that year for $238,000 (after transaction fees were deducted). At the time of their divorce (i.e., January 2014), Dr. Elkins' ex-wife signed the promissory note to repay him the proceeds from that sale. She agreed to pay him at least $5,000 a month, although she offset $3,000 a month in rent as Dr. Elkins at the time was subleasing an apartment from her. Dr. Elkins represented that his ex-wife had repaid $219,148 as of December 31, 2014.

In January 2015 Dr. Elkins proposed increasing his OIC from $17,500 to either (1) $33,000 over five months, or (2) $36,000 over 24 months. The revised amount was attributable to the balance on the promissory note ($13,852) and higher likely future income amounts ($3,096 over 12 months or $6,192 over 24

[*11] months).[9]  Dr. Elkins never submitted a revised Form 656 or a new

Form 433-A reflecting this proposal.

###### b.    Other Sources of Information

The offer specialist also performed a public records search about Dr. Elkins,

which turned up several news articles.  According to her case activity notes the

offer specialist reviewed a 2002 Wall Street Journal piece about IHS, which filed

for bankruptcy in 2000.  The article recounted that IHS executives had received

loans of "nearly $60 million--most of it going to Dr. Elkins himself" that they

were never required to pay back.  The article further stated that Dr. Elkins used

"company * * * [i.e., IHS] money contributed to a retirement plan set up for him"

to amass an art collection worth more than $8 million, with pieces being displayed

at Dr. Elkins' home despite being booked as company assets.  The offer specialist

also noted that other articles described Dr. Elkins and his then wife as "wealthy"

Naples residents and indicated that they were involved in a Texas health care

business.

---

[9]Dr. Elkins calculated his likely future income by subtracting monthly living expenses of $6,706 from monthly income of $6,964, which equaled $258 in monthly disposable income.  Dr. Elkins calculated his monthly income by averaging his adjusted gross income for 2011 through 2013.

**[*12]**     c.     Rejection of Dr. Elkins' OIC

In April 2015 the offer specialist sent a letter preliminarily rejecting Dr. Elkins' proposed settlement offer (which the letter took to be $32,444) as not in the best interest of the Government.  Computations attached to the letter recalculated Dr. Elkins' RCP as $71,192 based upon likely future income of $55,692 over 12 months and assets worth $15,500.[10]  Dr. Elkins responded by offering to increase his OIC to $71,500 and questioning the grounds for the rejection.

The offer specialist laid out her reasoning in both a telephone call to Dr. Elkins' representatives and a rejection memorandum.  Specifically the offer specialist reported that she saw no evidence of financial hardship and concluded that Dr. Elkins had structured his affairs to artificially qualify for currently-not-collectible status.  She noted that, even after submission of his OIC in 2014, Dr. Elkins lived a comfortable lifestyle that afforded him surplus cash for living expenses and allowed for him to drive a luxury car, eat out regularly, and travel

---

[10]The offer specialist calculated Dr. Elkins' likely future income by averaging his 2012 through 2014 income.  She derived his 2014 income ($189,057) from deposits into his primary bank account and used the adjusted gross income reported on his 2012 and 2013 tax returns ($149,290 and $45,548, respectively).  These income amounts averaged to $10,663 per month.  The offer specialist allowed $6,022 in living expenses, resulting in a monthly disposable income of $4,641.

**[*13]** frequently. She also observed that, despite Dr. Elkins' strong employment prospects in the healthcare industry, he reported no income while providing free consulting services to companies owned by his ex-wife, who paid his living expenses and made large postdivorce payments to him. And the offer specialist explained that Dr. Elkins' willingness to repeatedly increase his offer amount indicated that he had access to funds beyond his RCP.

The COIC territory manager approved the rejection, and the IRS issued a letter formally informing Dr. Elkins. Dr. Elkins timely appealed the rejection to the Office of Appeals.[11]

D.     Collection Activities and CDP Proceedings

During the pendency of Dr. Elkins' appeal the IRS began collection activities, issuing a Letter 3172, Notice of Federal Tax Lien Filing and Your Right to a Hearing under IRC 6320, with respect to his 1998, 2000, and 2001 liabilities on September 24, 2015. In response Dr. Elkins filed a timely Form 12153, Request for a Collection Due Process or Equivalent Hearing, in which he challenged the rejection of his OIC, his underlying tax liabilities, and the NFTL

---

[11]At the time of his appeal Dr. Elkins reduced his OIC from $71,500 to $71,192 to match the RCP calculated by the offer specialist.

**[\*14]** filing and requested verification of the IRS' compliance with multiple Code requirements.[12]

Dr. Elkins' CDP case was assigned to a settlement officer in the Office of Appeals and, per his request, was consolidated with his previously filed appeal of the OIC rejection. The settlement officer scheduled a telephone CDP hearing with Dr. Elkins for April 14, 2016, which was to be followed by a face-to-face meeting the next week. During the telephone hearing Dr. Elkins' representatives urged acceptance of his OIC on the grounds of his age and the unlikelihood that he would be able to pay his liabilities. They also threatened that Dr. Elkins would challenge his underlying liabilities if the OIC was not accepted. The face-to-face meeting did not occur, although the settlement officer and Dr. Elkins exchanged correspondence in which Dr. Elkins again pressed for acceptance of his OIC, noting that he did not have an egregious history of past noncompliance. He further claimed that the IRS' rejection of his OIC lacked managerial approval.

The settlement officer thereafter prepared a Form 14559, Appeals Offer in Compromise Memorandum (rejection memorandum). As an initial matter, the settlement officer calculated an RCP of $99,560, which was higher than Dr.

---

[12]Dr. Elkins did not indicate on Form 12153 that he was seeking a discharge or withdrawal of the lien.

[*15] Elkins' proposed OIC ($71,192). She did not recommend rejection on this ground, however. Instead she recommended sustaining the offer specialist's rejection on the ground that the offer was not in the best interest of the Government.

The settlement officer laid out several reasons for her conclusion. First, she noted that Dr. Elkins' annual income gave the appearance of having been "structured to decrease on a yearly basis since the posting of the TEFRA assessments", dropping from approximately $149,000 in 2012 to $45,000 in 2013 to $8,000 in 2014 ending with $879 in 2015. In the light of Dr. Elkins' ability to increase his offer amount on multiple occasions the settlement officer concluded that Dr. Elkins "has funds in excess of the income being reported" and that his various OIC submissions did not represent a good-faith attempt to "resolv[e] the outstanding income taxes". She drew the further conclusion that there was an arrangement between the former spouses, given that the income of Dr. Elkins' ex-wife had been unaffected by the divorce and his separation from the business, while Dr. Elkins' income suffered a precipitous decline.

Although the settlement officer acknowledged that Dr. Elkins did not have an egregious history of noncompliance, she nonetheless determined that he had not shown good faith. She noted that he had made no efforts to pay toward his tax

[*16] liabilities in the nearly four years since assessment. And she pointed out Dr. Elkins' "negative history" of using company retirement funds to purchase works of art and obtaining money from shareholders that he never repaid.

The settlement officer summarized that Dr. Elkins' actions "are not wholly credible, lack financial documentation, and the offer funds are not supported by the Taxpayer's current yearly income." She concluded that "[i]t was apparent to Collection and is equally evident to Appeals that the Taxpayer is not acting truthfully and likely has the ability to pay a significant [sic] larger amount on his tax debt than has been offered." The settlement officer subsequently communicated her conclusion to Dr. Elkins and closed the case.

On May 3, 2017, the Office of Appeals issued a notice of determination sustaining both the filing of the NFTL for the years at issue and the rejection of Dr. Elkins' OIC. As an initial matter, the notice stated that Dr. Elkins was precluded from challenging his underlying liabilities both because tax treatment of a partnership item must be determined at the partnership level and because a partnership-level proceeding counts as a prior opportunity under section 6330(c)(2)(B). The notice also indicated that the settlement officer verified that all requirements of applicable law and administrative procedure had been met.

**[\*17]** The notice further explained that the Internal Revenue Manual (IRM) permitted rejection of offers as not in the best interest of the Government, noting that the IRS was permitted to consider public policy and tax administration concerns in making such a determination. Sustaining the rejection of the OIC, the notice repeated the top-line points from the settlement officer's rejection memorandum: (1) Dr. Elkins had made no voluntary payments during the years the OIC had been pending; (2) Dr. Elkins had a negative history with respect to his use of company retirement funds; and (3) Dr. Elkins' repeated offers to increase his OIC belied "a good faith offer." The notice ended with a balancing analysis. After noting that Dr. Elkins' OIC was not a viable collection alternative, the notice concluded that the filed NFTL balanced the need for efficient collection of tax with Dr. Elkins' concern that collection be no more intrusive than necessary.

E.     Tax Court Proceedings

Dr. Elkins filed a timely petition with the Court seeking review of the notice of determination. Respondent subsequently filed a motion for summary judgment. For his part, Dr. Elkins objected and moved for a remand.

**[*18]**                    <u>Discussion</u>

I.      <u>Governing Principles</u>

   A.      <u>Summary Judgment</u>

The purpose of summary judgment is to expedite litigation and avoid costly, time-consuming, and unnecessary trials. <u>Fla. Peach Corp. v. Commissioner</u>, 90 T.C. 678, 681 (1988). Under Rule 121(b) the Court may grant summary judgment when there is no genuine dispute as to any material fact and a decision may be rendered as a matter of law. <u>Sundstrand Corp. v. Commissioner</u>, 98 T.C. 518, 520 (1992), <u>aff'd</u>, 17 F.3d 965 (7th Cir. 1994). In deciding whether to grant summary judgment, we construe factual materials and inferences drawn from them in the light most favorable to the nonmoving party. <u>Id.</u> However, the nonmoving party may not rest upon the mere allegations or denials of its pleadings but instead must set forth specific facts showing that there is a genuine dispute for trial. Rule 121(d); <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986).

   B.      <u>Standard of Review</u>

We have jurisdiction to review the Office of Appeals' determination pursuant to sections 6320(c) and 6330(d)(1). Where, as here, the underlying tax liabilities are not at issue, we review the determination of the Office of Appeals

**[\*19]** for abuse of discretion.[13]  Sego v. Commissioner, 114 T.C. 604, 610 (2000);

Goza v. Commissioner, 114 T.C. 176, 182 (2000).  In reviewing for abuse of

discretion, we must uphold the Office of Appeals' determination unless it is

arbitrary, capricious, or without sound basis in fact or law.  See, e.g., Murphy v.

Commissioner, 125 T.C. 301, 320 (2005), aff'd, 469 F.3d 27 (1st Cir. 2006);

Taylor v. Commissioner, T.C. Memo. 2009-27, 97 T.C.M. (CCH) 1109, 1116

(2009).

II.    Analysis

Dr. Elkins contends that the Office of Appeals abused its discretion in

sustaining the NFTL filing.  We consider whether the settlement officer:

(1) properly verified that the requirements of applicable law or administrative

procedure have been met; (2) considered any relevant issues Dr. Elkins raised; and

(3) considered whether "any proposed collection action balances the need for the

efficient collection of taxes with the legitimate concern of  * * * [Dr. Elkins] that

any collection action be no more intrusive than necessary."  See sec. 6330(c)(3).

Our review of the record establishes that the settlement officer satisfied all of these

requirements.

---

[13]In his petition and other pleadings Dr. Elkins expressly abandons and repeatedly disavows any challenge to the underlying tax liabilities.

**[*20]** A.     Verification

As an initial matter, this Court has authority to review satisfaction of the verification requirement regardless of whether the taxpayer raised that issue at the CDP hearing.  See Hoyle v. Commissioner, 131 T.C. 197, 201-203 (2008), supplemented by 136 T.C. 463 (2011).  The undisputed facts before us show that the settlement officer verified that timely assessments had been made against Dr. Elkins with respect to his 1998, 2000, and 2001 tax liabilities in the wake of the Delta Trading case.

Dr. Elkins faults the settlement officer for not digging deeper.  He believes that she was obligated to verify that all requirements of applicable law and administrative procedure were followed during the partnership-level case and that she did not do so.  Specifically Dr. Elkins asserts that the settlement officer did not verify that (1) the consents extending the limitations periods in the Delta Trading case were valid, and (2) the assessments of penalties against him complied with section 6751(b)(1).[14]

---

[14]Sec. 6751(b)(1) provides:  "No penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate."

[*21] Dr. Elkins' verification arguments fail to take into account the binding effect of our decision in Delta Trading. Section 6230(c)(4) provides that for purposes of any claim or suit challenging the Secretary's computational adjustments, "the treatment of partnership items * * * under the decision of the court * * * shall be conclusive. In addition, the determination * * * under the decision of the court * * * concerning the applicability of any penalty * * * shall also be conclusive." See also Tigers Eye Trading, LLC v. Commissioner, 138 T.C. 67, 89 (2012), aff'd in part, rev'd in part on other grounds, and remanded sub nom. Logan Tr. v. Commissioner, 616 F. App'x 426 (D.C. Cir. 2015). This Court entered a final decision resolving Delta Trading, and Dr. Elkins, as a partner, is therefore bound by it. The Delta Trading decision set forth adjustments to partnership items, upon which the computational adjustments made to Dr. Elkins' 1998, 2000, and 2001 tax liabilities were based. The decision also explicitly determined that the underpayments of tax attributable to partnership item adjustments were subject to 5% accuracy-related penalties. Dr. Elkins points to no authority that would allow us to set aside that binding decision or the assessments made in its wake.

Neither the Office of Appeals nor this Court can set aside our final decision in the partnership-level proceeding, the genesis of the assessments at issue. For

[*22] this reason, no bona fide interest would be served by remanding for verification. Cf. McAvey v. Commissioner, T.C. Memo. 2018-142, at *23.[15]

B.    Issues Raised

1.    Legal Background

The crux of the controversy here is the settlement officer's decision to sustain the offer specialist's rejection of Dr. Elkins' amended OIC of $71,192 as not in the best interest of the Government. Section 7122(a) authorizes the Secretary to compromise an outstanding tax liability on grounds that include doubt as to collectibility, the ground that Dr. Elkins urged. See sec. 301.7122-1(b)(2), Proced. & Admin. Regs. The Secretary may compromise a tax liability on this basis where the taxpayer's assets and income render full collection unlikely. Id.

The decision to accept or reject an OIC, along with the terms of the compromise, is in the Secretary's discretion. See id. para. (c)(1). The Commissioner has created guidelines for settlement officers to follow in evaluating an OIC. See Rev. Proc. 2003-71, sec. 2.02, 2003-2 C.B. 517, 517. Generally, an OIC based on doubt as to collectibility "will be considered

---

[15]In his petition Dr. Elkins claims that the settlement officer failed to verify the IRS' compliance with sec. 6404(g). He did not renew that argument in his subsequent motions and thus has abandoned it. See Pitts v. Commissioner, T.C. Memo. 2010-101, 2010 WL 1838282, at *7.

**[\*23]** acceptable if it is unlikely that the tax can be collected in full and the offer reasonably reflects the amount the Service could collect through other means, including administrative and judicial collection remedies" (i.e., the RCP). See Rev. Proc. 2003-71, sec. 4.02(2), 2003-2 C.B. at 517; see also IRM pt. 8.23.3.1(4) (Oct. 15, 2014).

The IRM advises, however, that in certain circumstances the Commissioner may reject an OIC if acceptance would not be in the best interest of the Government. See IRM pt. 5.8.7.7.1(1) (Oct. 7, 2016). It specifies that "the Service may take into account public policy and tax administration concerns in determining whether an offer to compromise is acceptable". Id. (quoting Rev. Proc. 2003-71, sec. 6.03, 2003-2 C.B. at 519).[16] It further states that "[r]ejections under this provision should not be routine and should be fully supported by the facts outlined in the rejection narrative." Id. The IRM gives a few nonexclusive examples justifying rejection for this reason, including where a taxpayer has an egregious history of noncompliance, as evidenced by his failure to pay the tax when he had the means to do so. Id. pt. 5.8.7.7.1(3).

---

[16]IRM pt. 5.8.7.7.2(1) (Oct. 7, 2016) states that "offers may be rejected on the basis of public policy if acceptance might in any way be detrimental to the interests of fair tax administration, even though it is shown conclusively that the amount offered is greater than could be collected by any other means".

[*24] In reviewing the settlement officer's determination we do not make an independent evaluation of what would be an acceptable collection alternative. See Thompson v. Commissioner, 140 T.C. 173, 179 (2013); Murphy v. Commissioner, 125 T.C. at 320; see also Randall v. Commissioner, T.C. Memo. 2018-123, at *9. "If the settlement officer followed all statutory and administrative guidelines and provided a reasoned, balanced decision, the Court will not reweigh the equities." Thompson v. Commissioner, 140 T.C. at 179; see also Lipson v. Commissioner, T.C. Memo. 2012-252, at *9.

We are mindful that we judge the propriety of the determination to sustain the rejection of Dr. Elkins' OIC on the grounds invoked by the Office of Appeals. See SEC v. Chenery Corp., 332 U.S. 194, 196 (1947); see also Antioco v. Commissioner, T.C. Memo. 2013-35, at *25 ("Applying Chenery in the CDP context means that we can't uphold a notice of determination on grounds other than those actually relied upon by the Appeals officer."). We will uphold a notice of determination of less than ideal clarity, however, if the basis for the determination may reasonably be discerned. See Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 285-286 (1974); see also Melasky v. Commissioner, 151 T.C. 93, 106 (2018), aff'd, 803 F. App'x 732 (5th Cir. 2020); cf. Kasper v. Commissioner, 150 T.C. 8, 24-25 (2018) ("Although we may not

**[\*25]** accept any <u>post hoc</u> rationalizations for agency action provided by the Commissioner's counsel, we may consider any 'contemporaneous explanation of the agency decision' contained in the record." (quoting <u>Tourus Records, Inc. v. Drug Enf't Admin.</u>, 259 F.3d 731, 738 (D.C. Cir. 2001))).

  2. <u>Analysis of the OIC</u>

The notice of determination identifies three reasons for sustaining the rejection of Dr. Elkins' OIC as not in the best interest of the Government: (1) the lack of good faith shown by the increasing values of Dr. Elkins' offers; (2) his failure to make any payments towards his outstanding tax liabilities during the pendency of the offer; and (3) his "negative history". Dr. Elkins argues that none of these reasons rises to the high level justifying a rejection of an OIC as not in the best interest of the Government. Looking at the proffered reasons in the light of the more detailed explanation provided in the settlement officer's contemporaneous rejection memorandum, we conclude that the determination to sustain the rejection of the OIC was neither arbitrary nor capricious, but, to the contrary, had a sound basis.

First, the notice of determination stated that Dr. Elkins' increases to his OIC did not show "good faith". As the settlement officer explained in more detail in the rejection memorandum, Dr. Elkins' ability to increase his offer several-fold

[*26] meant that he had "funds in excess of the income being reported" and that the various OIC submissions did not represent a good-faith attempt to "resolv[e] the outstanding income taxes". In reaching this conclusion she contrasted Dr. Elkins' ability to significantly increase his OIC from $17,500 (in January 2014) to $33,000 (in January 2015) to $71,500 (in April 2015) with the decreasing income amounts reported on his income tax returns between 2012 and 2015, during which time his reported income dropped from $149,000 to $879. She also noted that he continued to live a comfortable lifestyle without any ostensible paying job.

The notice of determination further relied upon Dr. Elkins' failure to make voluntary payments toward his assessed liabilities. In his opposition to summary judgment Dr. Elkins points out that he was under no obligation to do so. Context again is key. The IRS assessed Dr. Elkins' liabilities in 2013 after several years of litigation in the Tax Court and the entry of a decision whose terms Dr. Elkins expressly agreed to (in the stipulation of settled issues). In her rejection memorandum the settlement officer observed that Dr. Elkins had made no payments toward his assessed liabilities during the nearly 3-1/2 years since he had submitted his OIC. The settlement officer detailed his steps, at the same time, to structure his affairs to obscure his financial condition and ability to pay.

**[\*27]** Finally, the notice of determination referenced Dr. Elkins' "negative history" with respect to IHS.  Dr. Elkins attacks the purported source of this negative history--the Wall Street Journal article detailing his financial relationship with IHS–as hearsay and irrelevant.[17]

To the extent that Dr. Elkins' challenges the settlement officer's consideration of the Wall Street Journal article, the Federal Rules of Evidence do not apply in a CDP hearing, which is informal.  See Fed. R. Evid. 1101; see also Opp Cotton Mills, Inc. v. Adm'r of Wage & Hour Div. of DOL, 312 U.S. 126, 155 (1941).  Information is not "admitted" in the CDP hearing as "evidence", and it is not excluded from consideration by Appeals just because it could not be admitted into evidence in a proceeding governed by the Federal Rules of Evidence.

Of course, our Rules provide that a declaration in support of summary judgment "shall set forth such facts as would be admissible in evidence".  Rule 121(d).  But the Wall Street Journal article, which was attached as an exhibit to the settlement officer's declaration, does not constitute inadmissible hearsay.

---

[17]Dr. Elkins also argues that the article did not show an egregious history of past noncompliance with his tax obligations.  Although the IRM uses such history as an example that might justify rejection of an offer as not in the best interest of the Government, the IRM does not suggest that such a history is a sine qua non for rejection.  And the settlement officer did not assert that Dr. Elkins' tenure with IHS related to a history of tax noncompliance.

[*28] Hearsay is a statement offered in evidence to prove the truth of the matter asserted. Fed. R. Evid. 801(c).  The article is part of the administrative record, which was submitted to this Court not for the truth of the matters asserted but to show the documents that the settlement officer relied upon in making her decision to sustain the rejection of the OIC (and the NFTL filing).  The article thus would be admissible at trial or hearing for that purpose.  See Fed. R. Evid. 105 (use of evidence admitted for limited purpose must be restricted to that purpose); see also Levin v. Commissioner, T.C. Memo. 2018-172, at *28-*29, aff'd, 804 F. App'x 833 (9th Cir. 2020).

As to the relevance of the article, we note that the IRM permits a settlement officer to take into account public policy concerns in determining whether to accept an OIC.  See IRM pt. 5.8.7.7.1(1).  We would expect that the evaluation of the public policy implications of an OIC would involve consideration of taxpayer's prior history, including his financial dealings.  Cf. IRM pt. 5.8.7.7.2(2) (Oct. 7, 2016) ("A decision to reject an offer for public policy reason(s) should be based on the fact that public reaction to the acceptance of the offer could be so negative as to diminish future voluntary compliance by the general public.").  We see nothing wrong with the settlement officer's considering the negative history

**[\*29]** stemming from Dr. Elkins' tenure at IHS--in particular, the sizable benefits he received--when determining whether to accept a highly discounted OIC.

The reasons set forth in the notice of determination as further explicated in the contemporaneous rejection memorandum supply a sound basis for the settlement officer's determination. We thus conclude that she did not abuse her discretion in sustaining the rejection of Dr. Elkins' $71,192 OIC as not in the best interest of the Government.[18]

### C.    Balancing

Dr. Elkins next argues that this case should be remanded to the Office of Appeals because the settlement officer failed to balance the need for efficient collection of taxes with his legitimate concern that the collection action be no more intrusive than necessary. From our review, we are satisfied that the settlement officer did not abuse her discretion. She explained in the notice of determination that Dr. Elkins had not offered a viable collection alternative (given her sustaining the rejection of his OIC) and thus the NFTL filing was the least intrusive means of collecting the outstanding liability.

---

[18]Dr. Elkins also alleges that there was no territory manager's approval of the offer specialist's OIC rejection. Assuming arguendo that such approval is required, the record contains a copy of such an approval.

**[\*30]** In his opposition to summary judgment Dr. Elkins protests that his OIC would be a less intrusive means of collection. This argument ignores the fact that the OIC was off the table, leaving no less restrictive means than the NFTL filing. See Lindley v. Commissioner, T.C. Memo. 2006-229, 92 T.C.M. (CCH) 363, 368-369 (2006), aff'd sub nom. Keller v. Commissioner, 568 F.3d 710 (9th Cir. 2009). He also argues that the settlement officer failed to account for the economic hardship to him attendant to the NFTL filing. The administrative record demonstrates that the settlement officer well understood Dr. Elkins' position but nonetheless concluded that the NFTL filing was an appropriate way forward, a conclusion altogether consistent with the reasons she gave for sustaining the rejection of the OIC. We see no abuse of discretion in this regard.[19]

---

[19]In general, we may remand a CDP case for materially changed circumstances if it would be helpful, necessary, or productive. See, e.g., Churchill v. Commissioner, 102 T.C.M. (CCH) at 117. In his motion for remand, Dr. Elkins argues that the case should be remanded for materially changed circumstances in the light of the recent amendment to sec. 7803 adding subsec. (e)(7), which gives a taxpayer the right to the nonpriviliged portions of the case file regarding disputed issues at least 10 days before a conference with the Office of Appeals. See Taxpayer First Act, sec. 1001, 133 Stat. at 983. Sec. 7803(e)(7), however, applies only to "conferences occurring after the date which is 1 year after the date of the enactment of this Act." Taxpayer First Act sec. 1001(e)(2), 133 Stat. at 985. Dr. Elkins' CDP hearing was held approximately three years before the enactment of subsec. (e)(7), and thus he cannot avail himself of its benefits.

**[*31]** III.    <u>Conclusion</u>

In sum, there is no genuine dispute as to any material fact and a remand would be neither appropriate nor helpful.  Finding no abuse of discretion in any respect, we will grant summary judgment to respondent, deny Dr. Elkins' motion to remand, and sustain the notice of determination upholding the filing of the NFTL for the years at issue.

To reflect the foregoing,

<u>An appropriate order and</u>

<u>decision will be entered</u>.